**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, and CHARLES A. WHOBREY, as trustee<br><br>    Plaintiffs,<br><br>    v.<br><br>AL PEAKE AND SONS, INC.,<br><br>    Defendant. | Case No. 22-cv-02350<br><br>Judge Mary M. Rowland |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Central States, Southeast and Southwest Areas Pension Fund and Charles A. Whobrey, as trustee, ("the Fund") sued Defendant Al Peake and Sons Inc. ("Al Peake") under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq. [39]. The Fund filed a motion for summary judgement on their sole ERISA claim. For the reasons stated below, the Fund's motion for summary judgment [52] is granted.

**SUMMARY JUDGMENT STANDARD**

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v.*

1

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are material. *Id.* After a "properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 250 (internal quotations omitted).

The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and [] draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (internal citation and quotations omitted). The Court "must refrain from making credibility determinations or weighing evidence." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 467 (7th Cir. 2020) (*citing Anderson*, 477 U.S. at 255). In ruling on summary judgment, the Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [its] favor." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id.* (citation omitted).

## FACTS

The Court takes the following facts from the Fund's statement of facts, [54], and Al Peake's response to the statement of facts. [61].[1] The Court notes where a material fact is disputed.

---

[1] Al Peake did not file a separate statement of facts.

2

*The Agreement*

Between January 1, 2017, and September 30, 2023, Al Peake and IBT Local Union No. 20 (the "Union") were parties to successive collective bargaining agreements (the "CBA Agreement") pursuant to which Al Peake was required to make contributions to the Fund on behalf of its covered employees. [54] at ¶ 8. Covered employees included all CDL drivers and all regular drivers. *Id.* at ¶ 10. The CBA Agreement required Al Peake to make weekly contributions to the Fund for each driver who had been on Al Peake's payroll for thirty days. *Id.* ¶¶ 9-18. In addition to being bound by the terms of the CBA Agreement, Al Peake was bound by all the rules and regulations promulgated by the Trustees of the Fund under the Trust Agreement (Trust Agreement).[2]

Al Peake was required to pay contributions to the Fund on behalf of each covered employee at the following weekly rates: (a) $60.20 effective March 1, 2016; (b) $62.60 effective March 1, 2017; (c) $65.10 effective March 1, 2018; (d) $67.70 effective March 1, 2019; (e) $70.40 effective March 1, 2020; (f) $73.20 effective March 1, 2021; (g) $76.10 effective March 1, 2022; and (h) $79.10 effective March 1, 2023. *Id.* ¶ 24. The Trust Agreement permits the Fund to audit the records of participating employers to verify the accuracy and completeness of employee work history reported

---

[2] Section 2 of the CBA Agreement provides that "the Employer authorizes the Employer's Associations … to enter into appropriate Trust Agreement necessary for the administration of such Fund, and to designate the Employer Trustees under such agreement, hereby waiving all notice thereof and ratifying all actions already taken or to be taken by such Trustees within the scope of their authority." (Article XVI (Pension Program) of the 2012-2017 CBA). *Id.* ¶ 11.

by the employers.  *Id*. ¶ 22. It further requires employers "to pay audit fees and costs if litigation is required to obtain access to any records…" *Id*. ¶ 23.

In 2020, the Fund commenced an audit of Al Peake to verify the accuracy and completeness of the employee work history reported to the Fund by Al Peake. *Id*. ¶ 26. According to the Fund, the scope of the audit initially covered 2017 through 2019 but was subsequently expanded to cover 2020 through 2023 due to misreporting and non-reporting issues revealed from the 2017 audit. *Id*. Al Peake disputes that the initial pre-suit audit was confined to 2017 through 2019 and further disputes the audit expansion was due to its misreporting and non-reporting. [61] ¶ 26.

Prior to filing the lawsuit, according to the Fund, it submitted its audit findings to Al Peake and made five attempts to get in contact (via phone, voicemail, and email), but Al Peake did not respond. [54] at ¶¶ 42-43. On October 28, 2021, the Fund sent a letter to Al Peake detailing its 2017 through 2019 audit findings. *Id*. at ¶ 44. On November 2, 2021, an employee of the Fund sent an email to Al Peake advising that the Fund had sent the letter on October 28, 2021, and inquired why Al Peake had not responded. *Id*. at ¶ 45. On January 26, 2022, the Fund sent another letter to Al Peake noting its attempts to contact Al Peake concerning the 2017 through 2019 findings and advising that the matter would be referred to the Fund's delinquent accounts division and/or legal department for collection. *Id*. According to the Fund, when Al Peake did not respond to that inquiry, it referred the matter to Fund's Legal Department to file a collection suit on April 4, 2022. *Id*. at ¶ 46.

4

For its part, Al Peake admits it received "Preliminary Audit Results" in October 2021 and January 2022, purportedly covering the period from 2017 through 2019. [61] at ¶ 42. Al Peak contests that the audit findings were confined to period of 2017 through 2019, despite the Fund's representation to the contrary. *Id*. Al Peake admits that the Fund sent emails and made phone calls to Defendant between October 18 and 28. *Id*. at ¶ 43. Al Peake denies that it did not respond to the emails and voicemail messages—but it cites to no evidence in the record to support this position. *Id*. Significantly, Al Peake admits it did not provide any documents to support any discrepancies in the audit. *Id*. at ¶ 44. Finally, while Al Peake agrees that it received the January 26, 2022, letter, (warning that the matter could be referred to the legal department), it denies that the January 26, 2022, letter requested a response. *Id*. at ¶ 46.

Under 29 U.S.C. §1132 (g)(2), the parties agree the Fund is entitled to $169,057.00, plus interest on the contributions at the rate set forth in the Fund's trust agreements. [61] at ¶¶ 21, 33, 38. The Fund presents evidence that it is owed audit fees and costs in the amount of $23,700.00. [54] at ¶ 41. Al Peake admits that it is responsible for audit fees and costs, and it does not dispute that amount. [61] at ¶¶ 19, 23, 41. Finally, the Fund asserts it is owed (1) interest on the contributions at the rate set forth in the Fund's Agreement (*i.e.*, the greater of an annualized interest rate equal to 7.5% or 2% plus the prime interest rate established by JPMorgan Chase Bank, NA for the 15th day of the month for which the interest is charged) and (2) the

greater of interest or liquidated damages of 20% of the unpaid contributions. [54] at ¶ 21.

The Fund moves for summary judgment on the sole ERISA claim. [52].

## ANALYSIS

It is undisputed that Al Peake owes contributions to the Fund in the principal amount of $169,057.00, plus interest, for the period of 2017 through 2023 and the audit fees and costs that amount to $23,700. The parties dispute the other damages that the Fund seeks: (1) liquidated damages defined as the greater of interest or 20% of the unpaid contributions; and (2) reasonable attorney fees and costs. *See* 29 U.S.C. §1132(g)(2).

The Fund argues that because Al Peake failed to make its contributions in accordance with the terms and conditions of the agreement, the Fund is entitled to these additional *mandatory* damages under 502(g)(2) of ERISA, 29 U.S.C. §1132(g)(2). [53] at 8-10. Al Peake responds that the Court should deny the Fund's request for these damages *or* that there is a question of fact as to whether the Fund is entitled to these damages because the Fund (1) failed to mitigate its damages, or (2) breached the implied duty of good faith and fair dealing. [60] at 3-8. The Court analyzes each argument in turn.

## I.  Plaintiffs do not have a duty to mitigate.

The Fund relies on the statutory language of §1132 to argue that liquidated damages and attorney fees are required when an employer fails to make mandatory

contributions. The plain reading of the statute supports the finding that the disputed

damages are mandatory. 29 U.S.C. §1132(g)(2) provides:

> In any action under this subchapter by a fiduciary for or on behalf of a plan to enforce section 1145 of this title in which a judgment in favor of the plan is awarded, the court *shall* award the plan
>
> **(A)** the unpaid contributions,
> **(B)** interest on the unpaid contributions,
> **(C)** an amount equal to the greater of—
>      **(i)** *interest* on the unpaid contributions, *or*
>      **(ii)** *liquidated damages* provided for under the plan in an amount not in excess of 20 percent…
> **(D)** reasonable *attorney's fees and costs* of the action, to be paid by the defendant, and
> **(E)** such other legal or equitable relief as the court deems appropriate.
>
> For purposes of this paragraph, interest on unpaid contributions shall be determined by using the rate provided under the plan…

The Seventh Circuit has affirmed the mandatory nature of the damages

provision whenever a successful enforcement action has been filed. *See Cent. States,*

*Se. & Sw. Areas Pension Fund v. Gerber Truck Serv., Inc.,* 870 F.2d 1148, 1153 (7th

Cir. 1989) ("The district court *must* add the penalties provided by § 502(g)(2), [29

U.S.C. §1132(g)(2)] to whatever sums it ultimately awards to the plans as past-due

contributions.") (emphasis added). The Court has not found, and Al Peake has not

provided, any binding caselaw that states otherwise.

Although Al Peake does not dispute the audit's findings, Defendant responds

that the Fund sent "confusing, inaccurate, and misleading audit findings", and then

filed this lawsuit to incur unnecessary penalties, exacerbating rather than mitigating

damages. [60] at 6. From that Al Peake argues that the Trust failed to mitigate—

seemingly by confusing Defendant so that this dispute could not be resolved prior to the Fund filing litigation.

Al Peake has cited two cases to support the proposition that a duty to mitigate is appropriate in the ERISA context. But those cases are unpersuasive because they do not confirm that the duty even exists. In *Building Trades United Pension Trust Fund v. Esperanza Unida, Inc.*, 2006 WL 3300390, at * 11 (E.D. Wis. Nov. 14, 2006), while granting summary judgment to the Plaintiff pension fund, including liquidated damages and attorneys' fees and costs, the court noted that "it is unclear whether plaintiffs have a duty to mitigate damages under ERISA." The court went on to find that even if there was a duty to mitigate, the employer failed to establish the affirmative defense in that case. Similarly, in *Iron Workers' Loc. No. 25 Pension Fund v. Klassic Servs., Inc.*, 913 F. Supp. 541, 546 (E.D. Mich. 1996) the court found that the defendant did not cite any authority that the duty to mitigate damages in the ERISA context existed, and it further "fail[ed] to see how the duty to mitigate damages would apply in [that] case."

Even if there is a duty to mitigate damages in this context, the Court is hard pressed to find evidence that the Fund did not attempt to do so. It is undisputed that the Fund attempted to contact Al Peake several times to notify it of its audit findings. Al Peake disputes that it ignored the letters but there is not a shred of evidence that it responded. To the contrary, Al Peake asserts that the final letter from the Fund sent on January 26, 2022, failed to request a response. The only rational reading of

the record is that the Fund attempted to mitigate, and Al Peake refused to participate in the Fund's mitigation efforts.

Even taking the undisputed facts in the light most favorable to the Defendant, the Fund has established that it gave Al Peake ample notice and ample opportunity to pay what was owed—and only when the Fund received no response (and no payment) did it file this suit. While the Court does not believe that failure to mitigate is an affirmative defense available in this context, the Court also does not believe a rational jury could find that the Fund failed to mitigate its damages on this record.

## II. ERISA preempts state law regarding the duty of good faith and fair dealing.

Next, Al Peake argues that it is not liable for the disputed damages because the Fund abandoned its common law duty of good faith and fair dealing that is applicable in every contract, even in the ERISA context. Al Peake asserts that the Fund filed this lawsuit solely to get a windfall in damages. [60] at 7-9. The Fund argues that there is no duty of good faith and fair dealing in the ERISA context, and even if there were, it did not violate it. [64] at 6-7.

Neither party has cited to authority regarding the duty of good faith and fair dealing in the context of ERISA. In *Smith v. BlueCross and Blue Shield United of Wisconsin*, 959 F.2d 655, 658 (7th Cir. 1992), where plaintiff sought relief regarding his employee benefit plan, the Seventh Circuit found that all state law claims, including the plaintiffs' contract claims which imposed upon each party a duty of good faith and fair dealing, were preempted because "ERISA preempts all state laws which

9

relate to any employee benefit plan," *id*. at 657, citing 29 U.S.C. § 1144(a) (preemption clause). If an employee participant in an ERISA protected plan cannot assert a common law claim for good faith and fair dealing, the Court does not see a path for this Defendant to assert an affirmative defense based on the same principle. *See e.g. Smith v. Foremost Farms USA*, 2007 WL 101201, at \*4 (E.D. Wis. Feb. 8, 2007) (dismissing plaintiff's ERISA common law violation of good faith and fair dealing claim because "[the Court] will not carve out a new cause of action under federal common law for good faith and fair dealing in the ERISA context.").

And for reasons explained *supra*, even if one existed, the Court cannot find that the Fund breached the duty of good faith and fair dealing. It is undisputed that the Fund made multiple attempts to get in contact with Al Peake, yet Al Peake did not respond, let alone pay the contributions owed.

In short, this Court (1) declines to establish a common law duty of good faith and fair dealing applicable in this ERISA cases, and (2) finds that a rational jury could not find that the Fund violated it, even if it did exist. The Court grants the Fund's motion for summary judgment. [52].

## CONCLUSION

For the stated reasons, Plaintiffs' motion for summary judgment [52] is granted. Under 29 U.S.C. § 1132(g)(2) and the parties' Agreement, the Fund is entitled to a judgment in its favor and against Al Peake & Sons for: (a) contributions in the principal amount of $169,057.00; (b) interest on the contributions at the rate set forth in the Fund's Agreement (*i.e.*, the greater of an annualized interest rate

equal to 7.5% or 2% plus the prime interest rate established by JPMorgan Chase Bank, NA for the 15th day of the month for which the interest is charged); (c) the greater of interest or liquidated damages of 20% of the unpaid contributions; (d) audit fees and costs incurred by the Fund in connection with the Audit, which amount to a total of $23,700.00; and (e) reasonable attorneys' fees and costs. U.S.C. § 1132(g)(2)(E)). Civil case terminated. Judgment to enter.

E N T E R:

Dated: September 22, 2025

_____
MARY M. ROWLAND
United States District Judge

11